IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
*Northern Division*

| | |
|---|---|
| **JENNIFER ALBERO,**<br>INDIVIDUALLY, AND AS THE ADMINISTRATOR OF THE ESTATE OF KYLE ARTHUR<br>38024 North Spring Hill Road<br>Delmar, Delaware 19940<br><br>and<br><br>**TO THE USE OF: KEVIN ARTHUR**<br>16180 Janet Drive<br>Amelia Court House, Virginia 23002<br><br>     Plaintiffs,<br><br>v.<br><br>**WORCESTER COUNTY BOARD OF COMMISSIONERS**<br>**c/o Anthony W. Bertino, Jr., President**<br>One West Market Street<br>Snow Hill, Maryland 21863<br>(Worcester County)<br><br>and<br><br>**TIM MULLIGAN, WARDEN**<br>Worcester County Jail<br>5022 Joyner Rd<br>Snow Hill, MD 21863<br>(Worcester County)<br><br>and<br><br>**NAOMI CAMPBELL**<br>   Serve at:<br>   Worcester County Jail<br>   5022 Joyner Rd<br>   Snow Hill, MD 21863<br>   (Worcester County) | Case No.:  1:24-cv-1100<br><br>**Jury Trial Demanded** |

1

and

**MICHAEL TOWNSEND**
   Serve at:
   Worcester County Jail
   5022 Joyner Rd
   Snow Hill, MD 21863
   (Worcester County)

and

**NATHAN COOK**
   Serve at:
   Worcester County Jail
   5022 Joyner Rd
   Snow Hill, MD 21863
   (Worcester County)

and

**GUNNAR THOMPSON**
   Serve at:
   Worcester County Jail
   5022 Joyner Rd
   Snow Hill, MD 21863
   (Worcester County)

and

**CHRISTINE WATSON**
Suite 500
1283 Murfreesboro Pike
Nashville, TN 37217
   Serve on:
   Corporate Creations Network, Inc., #700
   2 Wisconsin Circle
   Chevy Chase, MD 20815

and

**MEAGAN HEARN**
Suite 500
1283 Murfreesboro Pike
Nashville, TN 37217
   Serve on:
   Corporate Creations Network, Inc., #700

2 Wisconsin Circle
Chevy Chase, MD 20815

and

**HANNAH VOELLER**
Suite 500
1283 Murfreesboro Pike
Nashville, TN 37217
    Serve on:
    Corporate Creations Network, Inc., #700
    2 Wisconsin Circle
    Chevy Chase, MD 20815

and

**ALEXIS LITTLEPAGE**
111 Overlook Drive, Apt. 2B
Salisbury, MD 21804
(Wicomico County)

and

**WELLPATH, LLC**
Suite 500
1283 Murfreesboro Pike
Nashville, TN 37217
    Serve on:
    Corporate Creations Network, Inc., #700
    2 Wisconsin Circle
    Chevy Chase, MD 20815

    Defendants.

## COMPLAINT AND JURY DEMAND

Plaintiff, Jennifer Albero, Individually and as Personal Representative of the Estate of Kyle Arthur, and to the use of Kevin Arthur, through counsel, Thomas Keilty and Nicholas Bonadio of Keilty Bonadio, LLC and Alexandra Walsh of Walsh Law, brings this action, and alleges as follows:

## INTRODUCTION

1. This is an action arising from the suicide of Kyle Arthur while he was a pretrial detainee in the custody of the Worcester County Jail ("WCJ"). Kyle was arrested for driving under the influence of a controlled substance and booked into WCJ on September 9, 2021. He informed the booking staff that he was withdrawing from opiates, a known risk for jail suicide. Kyle was also facing significant legal troubles, as this new charge was potentially a violation of his probation for a previous suspended sentence. Despite these significant suicide risks, Kyle was placed in an area with no closed-circuit monitoring and no suicide precautions were implemented. Foreseeably, his mental health rapidly deteriorated and he tragically hanged himself the day after he was booked.

2. But for the deliberate indifference and negligence or gross negligence of the correctional and healthcare staff acting under color of state law, Kyle would have received an adequate medical and mental health screening along with the treatment he needed, and he would not have died on September 10th.

3. At all relevant times, all defendants were acting under color of state law.

## PARTIES

4. Decedent Kyle Arthur lived in Salisbury, Maryland.

5. Plaintiff Jennifer Albero is a resident of Delmar, Delaware. Ms. Albero is the mother of the Decedent and the Personal Representative of his Estate. A copy of the Letters of Administration is attached as Exhibit A.

6. Claimant Kevin Arthur, a use plaintiff, was Kyle Arthur's father. Kevin Arthur is believed to be a resident of Amelia County Virginia.

7. Worcester County is an entity of local government of the State of Maryland that, by the Maryland Constitution and the Worcester County Charter, is a body corporate and politic that possesses the rights of self-government and home rule.

8. Defendant Worcester County Board of Commissioners ("BoC") is made up of seven individuals and is responsible for the general government of Worcester County, including the ownership and operation of the Worcester County Jail ("WCJ"). Worcester County, through its BoC, was responsible for the policies, practices, customs, and regulations governing and used at WCJ for the misconduct, acts, and omissions of its employees, agents, or servants. Plaintiff provided notice of this claim to Worcester County, c/o Anthony W. Bertino, President, under Md. Code Ann., Cts. & Judicial Proc. § 5-304, on or about March 30, 2023. A copy of the letter is attached as Exhibit B.

9. Defendant Tim Mulligan is the warden at WCJ. Warden Mulligan, individually and through his predecessors, was responsible for the policies, practices, customs, and regulations governing and used at WCJ for the misconduct, acts, and omissions of its employees, agents, or servants. Plaintiff provided notice of this claim to Warden Mulligan's predecessor, Fulton Holland, Jr., pursuant to Md. Code Ann., Cts. & Judicial Proc. § 5-304, on or about March 30, 2023. A copy of the letter is attached as Exhibit C.

10. At all relevant times, Defendant Naomi Campbell was a Correctional Officer employed by Worcester County at WCJ.

11. At all relevant times, Defendant Michael Townsend was a Correctional Officer employed by Worcester County at WCJ.

12. At all relevant times, Defendant Nathan Cook was a Correctional Officer employed by Defendant Worcester County at WCJ.

13. At all relevant times, Defendant Gunnar Thompson was a Correctional Officer employed by Defendant Worcester County at WCJ.

14. At all relevant times, Defendant Christine Watson was a Nurse employed by Defendant Wellpath, LLC.

15. At all relevant times, Meagan Hearn was a Licensed Practice Nurse (LPN) employed by Defendant Wellpath, LLC.

16. At all relevant times, Hannah Voeller was employed by Defendant Wellpath, LLC.

17. At all relevant times, Alexis Littlepage was a Nurse employed by Defendant Wellpath, LLC.

18. At all relevant times, Wellpath, LLC is a Limited Liability Company that provides health care services at correctional facilities nationwide. On information and belief, Worcester County contracted with an entity called Conmed for the provision of medical and mental health care at WCJ in the early 2000s. Conmed was acquired by Correct Care Solutions in 2012, and CCS was acquired by Wellpath in 2019.

## JURISDICTION AND VENUE

19. The claims against the healthcare provider defendants were filed in the Maryland Health Claims Alternative Dispute Resolution Office and, after meeting all conditions precedent, Plaintiff elected to waive arbitration. A copy of the Order of Transfer is attached as Exhibit D.

20. This Court has subject matter jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331, as this case involves question of federal law, and, as to the remaining claims, pursuant to 28 U.S.C. § 1367.

21. All Defendants either reside in, are employed in, or conduct substantial business in Worcester County, Maryland and all the tortious acts or omissions giving rise to these claims were committed in Maryland. Venue is therefore proper in this judicial district pursuant to 28 U.S.C. § 1391(b).

## **FACTS**

22. The CQE and expert report of Todd R. Wilcox, MD, attached as Exhibit E, is adopted and incorporated herein.

23. Mr. Arthur was arrested on September 9, 2021, for driving while under the influence of a controlled substance. He had previously received probation before judgment on a five-plus year sentence for theft, and this new charge presented a substantial threat to his freedom.

24. Mr. Arthur was booked into Worcester County Jail on the evening of September 9, 2021, at 6:02 pm.

25. A "Booking Report" noted a "Jail Alert" for "Drug Usage, Medical Alert."

26. According to an initial screening questionnaire recorded by CO Michael Townsend, Kyle admitted to heroin and methadone use and suggested he would be going through withdrawal.

27. Then, Mr. Arthur's initial medical screening, called a receiving screening, was apparently completed by Defendant Voeller at about 19:50 on September 9th.

28. On information and belief, Defendant Voeller held no license to practice nursing at the time. Public records indicate that she first received a temporary LPN license in 2023, more than a year after this interaction.

29. At a minimum, the standard of care requires that this initial screening be performed by mental health staff or, if one is unavailable, correctional staff specially trained in screening new detainees for mental health issues. Defendant Voeller meets neither criteria.

30. Kyle informed Defendant Voeller that he was taking Methadone 90 mg PO QD and that he had his last dose the day before, September 8, 2021. He also disclosed that he has last used IV drugs – fentanyl – the previous day. Fentanyl is even more potent than heroin, both in effect and in causing severe withdrawal and methadone withdrawal symptoms are also known to be

particularly severe. Both generally begin about 12-48 hours after cessation, so Kyle was just beginning to withdraw at the time of intake.

31. Along with his new significant legal troubles and opiate withdrawal, Kyle expressed to Defendant Voeller that he was concerned he would lose his job.

32. Opiate withdrawal, new significant legal trouble, and major negative life changes are all known risk factors for suicide.

33. Suicide is a known epidemic in detention facilities:

   a. In 2006, the suicide rate in detention facilities was about **three times** greater than in the general population;

   b. The vast majority of jail suicide victims, like Mr. Arthur, are white males under age 40;

   c. Most jail suicide victims, like Mr. Arthur, were intoxicated or going through withdrawal, and jail suicides disproportionately occur during the first 48 hours of detention;

   d. In a survey of 464 jail suicides from 2005 to 2006, nearly 60% happened in the first two weeks and, perhaps due to the timeline of withdrawal symptoms, ***more than half of these occur in the first 48 hours***.

34. Despite no special training or licensing, Defendants Worcester and Wellpath delegated the initial assessment of Mr. Arthur's physical and mental health, along with his fitness for general housing, to Defendant Voeller.

35. Even though Defendant Voeller had substantial information suggesting Mr. Arthur was at substantial risk for suicidal behavior, she decided that no referrals or special monitoring were necessary.

36. Additionally, a note in Defendant Voeller's record states that "On-call provider will be contacted for new orders." There is no record that the on-call provider was ever contacted or that any other treatment was offered.

37. According to the National Commission on Correctional Health Care's 2018 *Standards for Health Services in Jails and Prisons*, patients with known drug or alcohol problems must be adequately assessed and properly managed by qualified healthcare professionals.

38. On information and belief, Wellpath policies, which are modeled on NCCHC's policies, requires Wellpath staff must be trained to recognize that intoxicated individuals or individuals detoxing from alcohol or other drugs are at high risk for suicide.

39. At 10:19 pm, Defendant Littlepage assessed Mr. Arthur's COWS protocol score. She assigned 1 point for elevated pulse, 3 points for vomiting or diarrhea, and 1 point for "mild diffuse discomfort." Mr. Arthur was offered Gatorade and, even though, Defendant Littlepage purportedly entered medication orders for Tylenol, Imodium, and Meclizine, an anti-nausea medication, the medication administration record does not show that Defendant Littlepage administered any medication.

40. The next morning, at 5:41 am, Mr. Arthur was to receive a COWS screening again. But this appointment was deleted by Defendant Watson who asserted in the records that Mr. Arthur refused treatment.

41. On information and belief, there was no such refusal.

42. First, Mr. Arthur was amenable to treatment the prior night, had repeatedly asked about withdrawal treatment, and allowed the other staff to take his vitals just a few hours after the alleged refusal.

9

43. Second, Defendant Watson falsely asserts in the records that Mr. Arthur signed a refusal acknowledgment even though the form is unsigned.

44. Third, also just a few hours after the alleged refusal, Mr. Arthur met with Defendant Sgt. Naomi Campbell for further classification.

45. There are no contemporaneously written notes from this classification meeting with Sgt. Campbell, only a later-filed self-serving version of the meeting during which Sgt. Campbell asserts that Mr. Arthur was doing and fine and repeatedly complimented how well he was being treated at WCJ.

46. Sgt. Campbell did note that Kyle stated that he was withdrawing from opiates and asked if WCJ had a methadone program but, even though the U.S. Department of Justice views medication-assisted treatment (MAT) as the standard of care for opioid withdrawal, WCJ has no such program.

47. The DOJ has asserted that MAT should include "either an opiate agonist such as buprenorphine or methadone or an antagonist such as naltrexone."

48. Opiate withdrawal is a known risk factor for suicide, especially in detention center settings. According to the U.S. Bureau of Justice Assistance, "from 2000 to 2019, suicide was the leading cause of death among jail inmates." Opioid withdrawal was the most common drug-involved reason for suicide.

49. At about 1:41 pm, Corporal Nathan Cook opened the door to Mr. Arthur's cell block and summoned Mr. Arthur into the vestibule for COWS protocol with Defendant Hearn.

50. Even though Defendant Cook remained outside the cell block during this visit, he filed a self-serving incident note after the fact stating that he observed "good demeanor" and "nothing out of the ordinary."

51. To the contrary, Defendant Hearn recorded that Mr. Arthur's COWS score doubled from the previous assessment. Hearn assigned 4 points for pulse greater than 120, 2 for tremors, 3 for vomiting or diarrhea, and 1 for "mild diffuse discomfort."

52. While 4 points for pulse greater than 120 is the maximum score for tachycardia, Mr. Arthur's resting heart rate was 160 beats per minute, representing severe tachycardia, a medical emergency.

53. Severe tachycardia during opiate withdrawal places significant stress on the heart, can exacerbate dehydration and electrolyte imbalances, and can induce feelings of anxiety and panic, which can further elevate the heart rate in a feedback loop.

54. Despite this emergent medical situation, Defendant Hearn apparently provided Tylenol, Imodium, and Meclizine, none of which would treat Mr. Arthur's panic, anxiety, or severe tachycardia. The entire interaction lasted five minutes.

55. At no time did the Defendants refer Mr. Arthur for adequate medical evaluation or MAT with medication that would mitigate withdrawal, such as buprenorphine.

56. Exacerbating this neglect, Defendant Thompson was supposed to, at a minimum, perform security rounds in the cell block every thirty minutes.

57. Because Defendant Thompson was unable to see Mr. Arthur's cell from outside the cell block, and no close circuit surveillance camera showed Mr. Arthur's cell, this required Defendant Thompson to physically enter the cell block.

58. Not only did Defendant Thompson create a record admitting that these security checks only took place every hour, a video review suggests that Thompson only entered the cell block three times during his 8-hour shift.

59.     At 2:52 pm, Defendant Thompson was patrolling C-Block when they found Mr. Arthur hanging from his bed sheets. The sheets were attached to a metal bar installed in his cell. The officers freed Mr. Arthur from the sheet and put him on the floor, where Officer Thompson performed CPR.

60.     Medical staff and EMS arrived soon after and took over life-saving measures until 3:33 pm, when Mr. Arthur was pronounced dead.

## COUNT I
## 42 U.S.C. § 1983
## All Individual Defendants

61.     The preceding paragraphs are incorporated herein.

62.     At all times, Defendants Campbell, Townsend, Cook, Thompson, Watson, Hearn, Voeller, and Littlepage (the Individual Defendants) were acting under color of state law.

63.     Mr. Arthur was at all times a pretrial detainee at WCJ and was therefore owed the protections of due process of law under the Eighth and Fourteenth Amendments to the U.S. Constitution. Detainees and inmates are constitutionally entitled to detention in an environment that offers reasonable protection from harm.

64.     At all times, the Individual Defendants knew that Mr. Arthur was at an increased risk of suicide because, among other things, he was withdrawing from fentanyl and methadone, he was facing serious new legal consequences, and he feared that these legal consequences would cause him to lose his job.

65.     Additionally, Mr. Arthur fell within the demographic criteria associated with the highest risk of jail suicide: he was a white male under 40 years old, in the first 48 hours of detention, and was intoxicated or withdrawing from drug use at the time.

66.     Withdrawal from opiates and suicide risk are serious medical needs.

67. With actual knowledge of the risk factors in the preceding paragraphs, the Individual Defendants knowing deprived Mr. Arthur of his constitutional right to personal safety and protection, and his right to reasonable medical care to address his serious medical needs.

68. The Individual Defendants acted with deliberate indifference by, among other things:

   a. Delegating critical medical screening and medical decision making to Defendant Hearn, who had no nursing or other practice license and no special training to identify mental health and other medical issues in new detainees;

   b. Failing to refer Mr. Arthur for evaluation and risk assessment by a qualified healthcare provider;

   c. Failing to recognize known risk factors for suicide;

   d. Failing provide medication assisted treatment for opiate withdrawal;

   e. Failing to adequately treat Mr. Arthur's symptoms from opiate withdrawal;

   f. Failing to recognize that Mr. Arthur's severe tachycardia on September 10th was a medical emergency;

   g. Failing to recognize that Mr. Arthur's severe tachycardia on September 10th put him at a substantially higher risk for self-harming behavior due to anxiety or panic; and

   h. Failing to adequately monitor Mr. Arthur in his cell.

69. Defendant Watson also acted with deliberate indifference by failing to complete a scheduled evaluation in the morning on September 10th and falsely asserting that Mr. Arthur refused treatment and signed an acknowledgment of same.

70. Defendant Thompson acted with deliberate indifference by failing to perform physical security checks, providing Mr. Arthur ample time to formulate a plan and engage in self-harming behavior with the knowledge that he would not be interrupted.

71. Mr. Arthur did not hide the ball. He told the Individual Defendants about his drug use and oncoming withdrawal. He asked for medication assisted treatment because he knew he needed it. When it was clear he would not be given the treatment he needed, and the withdrawal symptoms became too severe to bear, he used the time and space provided by the inadequate monitoring to take his own life.

72. As a direct and proximate result of their deliberate indifference, the Individual Defendants deprived Mr. Arthur of his constitutional right to adequate medical care for his serious medical need and caused Mr. Arthur severe physical and mental anguish and death.

WHEREFORE, Plaintiff Jennifer Albero, as personal representative of the Estate of Kyle B. Arthur, requests that the Court enter judgment in her favor and against all Defendants, jointly and severally, as follows: (1) for compensatory damages of $5,000,000, which amount will be proven at trial; (2) for reasonable attorneys' fees and costs, as permitted under 42 U.S.C. § 1988; (3) pre- and post-judgment interest; (4) for punitive damages to the fullest extent permitted.

### COUNT II
### *Monell* - 42 U.S.C. § 1983
### Defendants Worcester County Board of Commissioners, Warden Tim Mulligan, and Wellpath LLC

73. The preceding paragraphs are incorporated herein.

74. Worcester County, through its Board of Commissioners, Tim Mulligan, warden at WCJ, and Wellpath (the Policymaker Defendants) owed the Decedent a duty to train, supervise, and retain competent correctional officers and healthcare providers, including in the ability to observe that detainees or inmates are suffering from alcohol or other drug disorders.

75. The Policymaker Defendants acted with deliberate indifference by creating or allowing a widespread custom or policy of failing to provide adequate treatment, including medication assisted treatment, to new detainees experiencing opiate withdrawal, and delegating critical healthcare screening decision making to unlicensed, untrained individuals, including Defendant Voeller.

76. The Policymaker Defendants knew, or should have known, that the Department of Justice and other federal agencies and work groups include medication assisted treatment for opiate withdrawal as the standard of care in jails and detention centers and that this standard aims to prevent cruel and unusual punishment, suffering, and death, including by suicide.

77. The Policymaker Defendants therefore knew that it was reasonably likely that failing to provide medication assisted treatment to detainees like Mr. Arthur would amplify the likelihood of physical and mental suffering, including self-harming behavior.

78. Wellpath, including through its subsidiaries and acquired companies, has provided healthcare in hundreds of detention centers and jails across the country. It has been sued thousands of times, including for delegating critical decision making to unqualified persons and failing to make timely referrals for mental health evaluation.

79. At a minimum, Wellpath has been sued for two suicides that occurred in a neighboring county in 2017 and 2018. Both cases involved similar allegations of improper delegation and delayed risk assessment.

80. Wellpath therefore knew that this policy or custom was reasonably likely to result in severe physical and emotional suffering and possible self-harming behavior, including suicide.

81. Worcester and Warden Mulligan acted with deliberate indifference by failing to train, supervise, and retain competent employees.

82. For example:

    a. WCJ employees failed to, among other things, train its officers to recognize the signs and symptoms of withdrawal. When Corporal Cook observed Nurse Hearn performing the quick detox check of Mr. Arthur on September 10, 2021, he noted "nothing out of the ordinary" despite Mr. Arthur having active, visible tremors and severe tachycardia;

    b. Sgt. Campbell failed to observe that Mr. Arthur's repeated pleas for medication assisted treatment for withdrawal was a clear sign of mental health distress, and took no action to mitigate the risk of suicide; and

    c. Defendant Townsend, during the initial screening, failed to recognize that Mr. Arthur required medical treatment.

83. Worcester and Warden Mulligan knew, or should have known, that failing to adequately train and supervise employees tasked with evaluating new detainees for medical and mental health needs was reasonably likely to cause suffering, injury, and death, including suicidal behavior.

84. The Policymaker Defendants also acted with deliberate indifference by allowing a widespread custom or policy of:

    a. Not placing new detainees experiencing opiate withdrawal on a higher level of monitoring; and

    b. Failing to perform the required 30-minute security checks. The widespread nature of this policy is evidenced by the fact that Defendant Thompson, in falsifying a record of hourly rounds he did not make, apparently did not know that he was supposed to make these rounds every thirty minutes, not every hour.

85. As a direct and proximate result of the Policymaker Defendants' allowance of the above widespread customs or policies, and failure to train/supervise, Mr. Arthur suffered severe emotional and physical distress and death.

WHEREFORE, Plaintiff Jennifer Albero, as personal representative of the Estate of Kyle B. Arthur, requests that the Court enter judgment in her favor and against all Defendants, jointly and severally, as follows: (1) for compensatory damages of $5,000,000, which amount will be proven at trial; (2) for reasonable attorneys' fees and costs, as permitted under 42 U.S.C. § 1988; (3) pre- and post-judgment interest; (4) for punitive damages to the fullest extent permitted.

**COUNT III**
**Due Process – Article 24 of the Maryland**
**Declaration of Rights**
**All Defendants**

86. Plaintiff hereby adopts and incorporates by reference all the allegations contained in all the paragraphs of this Complaint as though set forth fully below.

87. At all relevant times, Defendants acted under the color of the laws of the State of Maryland.

88. All actions of Defendants occurred within the course of their duty and the scope of their employment or agency as employees of Worcester County or Wellpath or as employees contracted to act on their behalf and Maryland's constitution and its principles of respondeat superior liability obligate counties and municipalities to avoid constitutional violations by their employees and contract-employees through, among other things, adequate training and supervision and by discharging or disciplining negligent or incompetent employees/contract employees.

89. The Defendants deprived Mr. Arthur of his life and liberty in violation of Article 24 of the Maryland Declaration of Rights when they knowingly failed to provide Mr. Arthur with

access to detox services to mitigate his risk of suicide and failed to provide adequate monitoring to Mr. Arthur while he was in C-Block. The Defendants knew Mr. Arthur was at increased risk for suicide and consciously failed to take the necessary actions to protect his safety.

90. The Defendants' knowing disregard for Mr. Arthur's serious medical need was malicious and with deliberate indifference and conscious disregard of Mr. Arthur's welfare.

91. The Defendants actions and omissions caused Mr. Arthur's suicide and thus deprived Mr. Arthur of his life and liberty as guaranteed by Article 24 of the Maryland Constitution.

WHEREFORE, Plaintiff Jennifer Albero, as personal representative of the Estate of Kyle B. Arthur, requests that the Court enter judgment in her favor and against all Defendants, jointly and severally, as follows: (1) for compensatory damages of $5,000,000, which amount will be proven at trial; (2) for reasonable attorneys' fees and costs, as permitted; (3) pre- and post-judgment interest; (4) for punitive damages to the fullest extent permitted.

### COUNT IV
### Medical Negligence
### Defendants Hearn, Voeller, Littlepage, Watson and Wellpath

92. All preceding paragraphs are incorporated herein.

93. Defendants Hearn, Voeller, Watson, Littlepage, and Wellpath, (the Health Care Provider Defendants) owed Mr. Arthur a duty to provide care commensurate with the standard of care for healthcare professionals practicing in a correctional setting.

94. The Health Care Provider Defendants breached their duties to the Mr. Arthur by, among other things:

    a. Failing to perform necessary welfare checks;

    b. Failing to recognize known risk factors for suicide;

    c. Failing to place Mr. Arthur on a higher level of observation;

    d. Failing to provide adequate medical care to treat Mr. Arthur's withdrawal from several drugs of abuse, including a substantial dose of methadone;

    e. Failing to provide adequate mental health monitoring;

    f. Exacerbating the risk of suicide by placing Mr. Arthur in a cell with elevated anchor mechanisms that are the most common utilities used in suicide attempts;

    g. Failing to offer continuity of care for patients enrolled in community medication assisted treatment for opiate use when they arrive at WCDC; and

    h. Failing to consult with a physician.

95. Defendants' breaches of their duties directly and proximately caused the Decedent's injuries and death.

WHEREFORE, Plaintiff Jennifer Albero, as personal representative of the Estate of Kyle B. Arthur, requests that the Court enter judgment in her favor and against all Defendants, jointly and severally, as follows: (1) for compensatory damages of $5,000,000, which amount will be proven at trial; (2) for reasonable attorneys' fees and costs, as permitted; (3) pre- and post-judgment interest; (4) for punitive damages to the fullest extent permitted.

### COUNT V
### Wrongful Death
### All Defendants

96. All preceding paragraphs are incorporated herein.

97. The acts and omissions herein caused the death of Kyle Arthur.

98. Jennifer Albero is the natural mother of Kyle Arthur.

99. As a direct and proximate result of the breaches in the standard of care and the intentional and willful and wanton conduct in the previous paragraphs, Jennifer Albero has

suffered damages, including loss of society and affection, loss of support, and other emotional distress related to the loss of her son.

WHEREFORE, Plaintiff Jennifer Albero requests that the Court enter judgment in her favor and against all Defendants, jointly and severally, as follows: (1) for compensatory damages of $5,000,000, which amount will be proven at trial; (2) for reasonable attorneys' fees and costs, as permitted; (3) pre- and post-judgment interest; (4) for punitive damages to the fullest extent permitted.

## JURY TRIAL DEMAND

Plaintiffs demand a jury trial.

Date:   April 16, 2024                         Respectfully submitted,

/s/ Thomas W. Keilty
Thomas W. Keilty, III (18992)
tkeilty@kblitigation.com
One South Street
1 South Street, Suite 2125
Baltimore, Maryland 21202
Telephone: 410-646-8880

WALSH LAW PLLC
Alexandra M. Walsh (*admission pending*)
14 Ridge Square NW, Suite 300
Washington, DC 20016
Tel: (202) 780-4127
Fax: (202) 780-3678
Email: awalsh@alexwalshlaw.com

*Attorneys for Plaintiff*