## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **JENNIFER ALBERO, et al.,** | * | |
| **Plaintiffs,** | * | |
| **v.** | * | **Civ. No. JKB-24-1100** |
| **WORCESTER COUNTY BOARD OF** | * | |
| **COMMISSIONERS, et al.,** | * | |
| **Defendants.** | * | |

\*       \*       \*       \*       \*       \*       \*       \*       \*       \*       \*       \*

## MEMORANDUM

Jennifer Albero, individually and on behalf of her son Kyle Arthur's estate, sued the Board

of Commissioners of Worcester County, Maryland ("County"), along with a contractor and various

personnel of the Worcester County Jail ("Jail"), for failing to prevent Arthur's suicide while he

was being held in pretrial detention. (*See* ECF No. 1 at ¶¶ 1, 4–18.) Arthur's father, Kevin Arthur,

is named as a use plaintiff.[1]  (*Id.* at ¶ 6.)

Now before the Court are three motions: a Motion to Dismiss or, in the Alternative, Motion

to Bifurcate and Stay Discovery, filed by the County, (*see* ECF No. 33); a Motion to Dismiss for

Failure to State a Claim, filed by Corporal Nathan Cook, (*see* ECF No. 41); and a Motion to

Dismiss or, in the Alternative for Summary Judgment, filed by Sergeant Naomi Campbell, (*see*

ECF No. 48).[2]  The motions are fully briefed, and no hearing is required. *See* Local Rule 105.6

---

[1] For purposes of this decision, "Arthur" refers only to Kyle Arthur, not to his father, Kevin Arthur.

[2] Two additional ripe motions to dismiss, each filed by Wellpath, LLC ("Wellpath") and/or other defendants who were Wellpath's employees during the events at issue, (*see* ECF Nos. 53, 64), will not be considered at this time.  All claims against Wellpath were automatically stayed following Wellpath's declaration of Chapter 11 bankruptcy on November 11, 2024. (ECF No. 70 at 1; ECF No. 72 at 1.)  The parties have since indicated that the bankruptcy court "confirmed that the automatic stay applies to claims against Wellpath *and its employees*" until the earlier of (1) the resolution or dismissal of the bankruptcy proceedings and (2) April 30, 2025. (*See* ECF No. 75 at 1 (emphasis added).)  As a result, this Court has temporarily stayed Plaintiffs' claims against the Wellpath-affiliated defendants. (ECF No. 76 at 1.)

(D. Md. 2023).

For the reasons set forth below, the County's motion will be granted in part and denied in part, while Corporal Cook's and Sergeant Campbell's motions will be granted. A separate order will issue to effectuate this decision.

## I.    BACKGROUND

### A.    Factual Background[3]

On September 9, 2021, police arrested Kyle Arthur, then thirty-six years old, for driving under the influence of a controlled substance. (ECF No. 27 at ¶ 23; ECF No. 27-6 at 5.)[4] At the time, Arthur was on prejudgment probation for a theft charge, conviction of which would have resulted in a sentence of more than five years in prison. (*See* ECF No. 27 at ¶ 23.) As a result, the DUI arrest "presented a substantial threat to [Arthur's] freedom." (*Id.*)

Around 6 p.m. that evening, Arthur was booked into the Jail. (ECF No. 27 at ¶ 24.) His booking report included a "Jail Alert" noting "Drug Usage, Medical Alert." (*Id.* at ¶ 25; ECF No. 48-2 at 2.) A separate screening questionnaire by Michael Townsend, one of the Jail's correctional officers, states that Arthur "admitted to heroin and methadone use and suggested he would be going through withdrawal," (ECF No. 27 at ¶¶ 11, 26; *accord* ECF No. 48-3 at 2), and that Arthur denied prior suicide attempts or thoughts of self-harm, (ECF No. 48-3 at 2). Sergeant Naomi Campbell, another of the Jail's correctional officers, was also present. (*See* ECF No. 27-6 at 5 ("During booking, [Arthur] admitted to COs Michael Townsend and Naomi Campbell that he was a cocaine and opiate user and that he was currently withdrawing from methadone.").)

---

[3] The following representations of fact are reproduced from the allegations set forth in Plaintiffs' Amended Complaint, (ECF No. 27), and certain documents adopted therein, *see infra* note 5. For purposes of assessing the pending motions, these allegations are assumed true. *See Adams v. Bain*, 697 F.2d 1213, 1216 (4th Cir. 1982).

[4] All pincites refer to the page numbers of documents as they appear on the electronic docket, which numbers are typically stamped onto the top of each individual page (following the case number, ECF number, and date). These stamped page numbers are not necessarily the same as those that appear in the documents' original text.

In Plaintiffs' view, this was enough to show that Arthur "was . . . suffering from opioid use disorder" ("OUD"), a "chronic brain disease with potentially deadly complications." (*See* ECF No. 27 at ¶¶ 27–28.) Because OUD "affects the brain and neurological functions and substantially impairs major life activities," it is considered a disability. (*Id.* at ¶ 29.) To treat OUD, the FDA has approved three drugs (methadone, buprenorphine, and naltrexone), whose dosage and duration require individualized, professional medical consideration. (*Id.* at ¶¶ 30–31.) Bringing an abrupt end to someone's medication treatment for OUD "is known to cause excruciating withdrawal symptoms and puts them at heightened risk for relapse, overdose, and/or death." (*Id.* at ¶ 32; *see also id.* at ¶ 37 (noting that, even individually, the symptoms of withdrawal from methadone and fentanyl can be "severe").)

Around 7:50 p.m., Hannah Voeller—an employee of Wellpath, LLC ("Wellpath"), the Jail's health-services contractor—completed an initial medical screening of Arthur. (ECF No. 27 at ¶¶ 16, 18, 34.) During the screening, Arthur told Voeller he was taking ninety milligrams of methadone orally every day, but that his last dose had been September 8, the day before. (*See id.* at ¶ 37; *see also* ECF No. 27-6 at 5.) He also disclosed that it had been a day since his last fentanyl use, well within the twelve- to forty-eight–hour window in which Plaintiffs say users of both drugs begin to experience withdrawal. (*See* ECF No. 27 at ¶ 37; *see also* ECF No. 27-6 at 5.) Finally, in response to questions from Voeller, Arthur denied any prior suicide attempts, (ECF No. 48-4 at 10), as well as any "actual thoughts" of killing himself, (*id.* at 6, 13; *see also id.* at 49 ("Pt [patient] denies SI/HI [suicidal ideation/homicidal ideation].")).

In addition to concerns about his nascent withdrawal, Arthur expressed to Voeller worries about his new arrest and the prospect of losing his job—each a "known risk factor[] for suicide." (*See* ECF No. 27 at ¶¶ 38–39.) Other risk indicators included the fact of being held in a detention

3

facility, (*see id.* at ¶ 40(a)); the fact that "[t]he vast majority of jail suicide victims . . . are white males under age 40," (*id.* at ¶ 40(b)); the fact that "[m]ost jail suicide victims . . . [a]re intoxicated or going through withdrawal," (*id.* at ¶ 40(c); *see also id.* at ¶ 56); and the fact that "jail suicides disproportionately occur during the first 48 hours of detention," (*see id.* at ¶ 40(c)–(d)). Even so, Voeller decided neither to refer nor arrange special monitoring for Arthur. (*Id.* at ¶ 42; *see also* ECF No. 27-6 at 5 ("[The Jail] placed [Arthur] in the general housing population with no suicide precautions.").) And while Voeller did write in her screening report that an "[o]n-call provider will be contacted for new orders," there is no indication that this occurred or "that any other treatment was offered." (ECF No. 27 at ¶ 43.)

Plaintiffs contend the industry standard of care for correctional medicine requires initial screenings to be performed by "mental health staff or, if one is unavailable, correctional staff specially trained in screening new detainees for mental health issues." (ECF No. 27 at ¶ 29; *see also id.* at ¶ 44 ("According to the National Commission on Correctional Health Care[] . . . , patients with known drug or alcohol problems must be adequately assessed and properly managed by qualified healthcare professionals.").) Wellpath's internal policies likewise require that its staff "be trained to recognize that intoxicated individuals or individuals detoxing from alcohol or other drugs are at high risk for suicide." (*Id.* at ¶ 45.) Plaintiffs allege that, at the time of Arthur's initial screening, Voeller had "no special training" in carceral mental health, (*see id.* at ¶ 41; *see also* ¶ 36), and was not even licensed to practice nursing until 2023, over a year later, (*id.* at ¶ 35.)

Around 10:19 p.m., Alexis Littlepage, a nurse employed by Wellpath, assessed Arthur's score on the Clinical Opiate Withdrawal Scale ("COWS"). (ECF No. 27 at ¶¶ 17, 46.) She assigned him one point for elevated pulse, three points for vomiting and/or diarrhea, and one point for "mild diffuse discomfort." (*Id.* at ¶ 46.) In response, she offered Arthur Gatorade and entered

orders for Tylenol, Imodium (an antidiarrheal), and Meclizine (an anti-nausea medication), though there is no record of Arthur actually taking any of the drugs. (*Id.*) Like Voeller, Nurse Littlepage recorded that Arthur did not express thoughts of self-harm. (ECF No. 48-4 at 17; *see also id.* at 49 ("No SI [suicidal ideation] at this time.").)

Arthur was scheduled to receive another COWS assessment at 5:41 a.m. the next morning, September 10. (ECF No. 27 at ¶ 47.) At some point, however, the appointment was "deleted" by Christine Watson, a second Wellpath nurse, who recorded that Arthur had refused treatment. (*Id.* at ¶¶ 14, 47.) Plaintiffs reject that account, arguing that Arthur had been "amenable to treatment the prior night, had repeatedly asked about withdrawal treatment, and allowed the other staff to take his vitals just a few hours after the alleged refusal." (*Id.* at ¶¶ 48–49.) Plaintiffs also note that Nurse Watson recorded Arthur as having signed a refusal form, despite the form being unsigned. (*Id.* at ¶ 50.)

In Plaintiffs' view, that Arthur would decline treatment is belied by a second meeting with Sergeant Campbell around 10:40 a.m., "just a few hours after the alleged refusal." (*See* ECF No. 27 at ¶¶ 10, 51; ECF No. 48-7 at 1.) Plaintiffs say Campbell made no contemporaneous record of the meeting, instead writing "only a later-filed self-serving" report that Arthur "was doing . . . fine and repeatedly complimented how well he was being treated." (ECF No. 27 at ¶ 52.) Despite that criticism, Plaintiffs adopt some of the report's other statements, including that Arthur reraised his withdrawal symptoms and asked if the Jail had a methadone program. (*Id.* at ¶ 53; *see also* ECF No. 48-7 at 1.) Plaintiffs also insist that, throughout the meeting, Campbell "failed to observe that Mr. Arthur's repeated pleas for medication assisted treatment . . . w[ere] a clear sign of mental health distress," and afterward "took no action to mitigate the risk of suicide." (ECF No. 27 at ¶ 96(b).)

5

For its part, Sergeant Campbell's report states that, after telling Arthur the Jail did not have a methadone program, Campbell informed him that the Jail *did* have a "detox protocol" and "that medical w[ould] take care of him." (ECF No. 48-7 at 1–2.) It also states that Arthur described his prior detention in two other facilities, one of whose staff he said were less helpful than the Jail's. (*See id.*) Finally, it states that Campbell "advised . . . Arthur that if he needed anything[,] to let the officers know," after which she escorted him back to his unit "without any issues." (*Id.* at 2.)

Despite Sergeant Campbell's reference to a detox protocol, not to mention Plaintiffs' own allegations about withdrawal-related visits (including COWS assessments), Plaintiffs allege that neither Wellpath nor the County (with respect to its oversight of the Jail) "ha[d] *any* policy in place to manage and treat inmates undergoing opiate withdrawal." (*See* ECF No. 27 at ¶ 33 (emphasis added); *see also id.* at ¶ 54.) They also assert that both entities "maintained a widespread practice of discontinuing methadone medication for inmates" who were receiving the drug prior to detention, (*id.* at ¶ 55), contrary to guidance from the U.S. Department of Justice advising medication-assisted treatment for opioid withdrawal in carceral settings. (*See id.* at ¶ 53.)

Around 1:41 p.m. on September 10, a third correctional officer, Nathan Cook, visited Arthur's cellblock and summoned Arthur to the vestibule for a second COWS assessment. (ECF No. 27 at ¶¶ 12, 57.) Corporal Cook waited outside the block the entire time, which Plaintiffs imply did not allow for any meaningful interaction with Arthur. (*See id.* at ¶ 58.) Plaintiffs also describe as "self-serving" an incident note that Corporal Cook recorded later, which described Arthur as having a "good demeanor" and observed "nothing out of the ordinary" about him. (*Id.*)

The second COWS assessment was to be conducted by Meagan Hearn, a third Wellpath nurse. (ECF No. 27 at ¶¶ 15, 57.) She assigned Arthur a COWS score of double what he had been assigned earlier: four points—the maximum—for elevated pulse, two points for tremors, three

points for vomiting and/or diarrhea, and one point for "mild diffuse discomfort." (*See id.* at ¶¶ 59–60.) At the time, Arthur's resting heart rate was 160 beats per minute, "representing severe tachycardia." (*Id.* at ¶ 60.) Plaintiffs contend that severe tachycardia during opioid withdrawal "places significant stress on the heart, can exacerbate dehydration and electrolyte imbalances, and can induce feelings of anxiety and panic, which can further elevate the heart rate." (*Id.* at ¶ 61.) Nonetheless, after just five minutes with Arthur, Nurse Hearn "apparently provided" the same over-the-counter medications that Nurse Littlepage had offered the night before: Tylenol, Imodium, and Meclizine. (*Id.* at ¶ 62.) Plaintiffs allege none of these drugs would have been effective in treating Arthur's panic, anxiety, and tachycardia. (*Id.*) Nor did anyone refer Arthur "for adequate medical evaluation or [medication-assisted treatment] that would mitigate withdrawal." (*Id.* at ¶ 63; *see also* ECF No. 27-6 at 5.) Finally, like Voeller and Nurse Littlepage, Nurse Hearn recorded that Arthur "denie[d] any SI [suicidal ideation]." (ECF No. 48-4 at 49–50.)

That afternoon, a fourth correctional officer, Gunnar Thompson, had been scheduled to conduct security rounds in Arthur's cellblock every thirty minutes. (ECF No. 27 at ¶¶ 13, 64.) Arthur's cell was not visible from outside the block. (*Id.* at ¶ 65.) It was also not visible on any closed-circuit surveillance feed. (*Id.*) The only way to see what was happening in the cell was for Officer Thompson physically to enter the block. (*Id.*) Officer Thompson recorded performing security checks just once every hour, half as often as he should have. (*Id.* at ¶ 66.) And Plaintiffs say surveillance footage shows him visiting even less than that—just three times during his entire eight-hour shift. (*Id.*)

At 2:52 p.m., during one of Officer Thompson's visits to Arthur's cellblock, Thompson discovered Arthur hanging from his bedsheets in his cell. (ECF No. 27 at ¶ 67.) With the aid of other officers, Thompson freed Arthur and laid him on the floor, where Thompson performed CPR.

(*Id.*)  Jail medical staff and emergency services arrived shortly after and performed life-saving measures until 3:33 p.m., when they pronounced Arthur dead.  (*Id.* at ¶ 68.)

Plaintiffs attach to their pleadings a certification and report by putative expert Dr. Todd R. Wilcox.  (ECF No. 27-6.)  Dr. Wilcox is a physician specializing in "Urgent Care Medicine."  (*See id.* at 2.)  His documents briefly recount Arthur's experiences in the Jail, (*see id.* at 5), and state that, in Dr. Wilcox's "expert opinion, within a reasonable degree of medical probability, . . . there were deviations from the applicable standards of care for monitoring and treatment of" Arthur, (*id.*; *see also id.* at 2–3).  The documents also assert that, "[w]ithin a reasonable degree of medical probability, had [the Jail] and Wellpath staff complied with the standard of care, Mr. Arthur would still be alive."  (*Id.* at 3, 5.)[5]

---

[5] Multiple documents cited above were supplied not by Plaintiffs, but by Sergeant Campbell, as exhibits to her motion to dismiss.  (*See* ECF No. 48-2 (Officer Townsend's booking report); ECF No. 48-3 (Officer Townsend's screening questionnaire); ECF No. 48-4 (Arthur's full patient history, including Voeller's initial medical screening and Nurses Littlepage's and Hearn's subsequent assessments); ECF No. 48-7 (Sergeant Campbell's report).)

    The Court is entitled to consider these documents without converting the motion to dismiss into one for summary judgment.  While a motion to dismiss ordinarily focuses on the allegations made in the complaint, a court "may consider a document submitted by the movant that was not attached to or expressly incorporated in a complaint, so long as the document was integral to the complaint and there is no dispute about the document's authenticity." *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016) (citations omitted).  Here, Plaintiffs' liberal citation to and/or quotation from the documents, (*see, e.g.*, ECF No. 27 at ¶¶ 25–26, 34, 37–38, 43, 46, 51–53), integrates them into the Amended Complaint. *See Goines*, 822 F.3d at 166 (explaining that an exhibit, or some part of it, is integral "where the complaint relies heavily upon its terms and effect" (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002)).  Plaintiffs also do not dispute the records' authenticity—or, for that matter, argue in any way against their use in this posture.

    The Court is also entitled to assume the truth of certain statements within those documents.  "[I]n cases where the plaintiff attaches or incorporates a document for purposes *other than* the truthfulness of the document, it is inappropriate to treat the contents of that document as true." *Goines*, 822 F.3d at 167 (emphasis added).  But "[w]hen the complaint . . . shows that the plaintiff has adopted the contents of the document, crediting the document over conflicting allegations in the complaint is proper." *Id.*  Here, Plaintiffs adopt much of what is asserted in each of the documents.  (*See, e.g.*, ECF No. 27 at ¶¶ 25–26, 34, 37–38, 46, 51, 53.)  Where Plaintiffs specifically indicate they do not adopt a document's contents, (*see, e.g.*, *id.* at ¶ 43 (emphasizing a lack of a corroborating record); *id.* at ¶ 52 (stating "[t]here are no contemporaneously written notes from [Arthur's] classification meeting with Sgt. Campbell")), the Court, mindful of its obligations under Rule 8, follows Plaintiffs' lead.  Otherwise, where Plaintiffs make no such suggestion (or offer a nonspecific one, like calling a report "self-serving" and "later-filed"), then proceed to provide a partial or conflicting account of a documents' contents, (*compare, e.g.*, ECF No. 48-7 at 1–2 (stating that Campbell said the Jail did not have a methadone program but did have a detox protocol), *with* ECF No. 27 at ¶ 53 (omitting the detox remark while adopting the methadone remark)), the document prevails. *See Goines*, 822 F.3d at 166–67.

### B.    Procedural History

On April 16, 2024, Albero, both individually and as the administrator of Arthur's estate, sued the County, vis-à-vis its Board of Commissioners; the Jail's current warden, Tim Mulligan; the Jail's medical contractor, Wellpath; Wellpath employees Voeller and Nurses Watson, Hearn, and Littlepage; and four of the Jail's correctional officers—namely, Sergeant Campbell, Corporal Cook, and Officers Townsend and Thompson. (ECF No. 1 at 1–3.) Arthur's father, Kevin, whose whereabouts are uncertain, was named as a use plaintiff. (*See id.* at ¶ 6.) Warden Mulligan was later dismissed voluntarily. (ECF No. 7 at 1.)

On July 7, 2024, Plaintiffs filed an Amended Complaint. (ECF No. 27.) The Amended Complaint names the same defendants as before, save for the addition of Fulton Holland, Warden Mulligan's predecessor. (*See id.* at 1; ECF No. 1 at ¶ 9.) Like Mulligan, Warden Holland and Officer Townsend were eventually voluntarily dismissed. (ECF No. 62.)

Plaintiffs raise a total of eight theories of liability. Two concern violations of the U.S. Constitution. Count I, brought under 42 U.S.C. § 1983 against the correctional officers (Sergeant Campbell, Corporal Cook, and Officer Thompson) and the Wellpath employees (Voeller and Nurses Littlepage, Watson, and Hearn) (collectively, "Individual Defendants"), alleges discrete violations of Arthur's rights under the Eighth and Fourteenth Amendments. (ECF No. 27 at ¶¶ 69–80.) Count II, brought under § 1983 against Wellpath and the County, alleges programmatic violations of those Amendments vis-à-vis the two defendants' policies or customs—that is, on the theory of municipal § 1983 liability recognized in *Monell v. Department of Social Services*, 436 U.S. 658 (1978).[6] (*Id.* at ¶¶ 81–103.)

---

[6] In their *Monell* count, Plaintiffs do not state expressly which of Arthur's rights Wellpath and the County allegedly violated. (*See* ECF No. 27 at ¶¶ 81–103.) But because the *Monell* claims are highly similar to the claims against the correctional officers and the Wellpath employees, the Court construes the *Monell* claims as asserting violations of the same substantive rights—namely, Arthur's rights under the Eighth and Fourteenth Amendments.

Two other theories of liability concern violations of the Maryland state constitution. Count III, brought against all Defendants, alleges discrete violations of Arthur's due process rights under Article 24 of the Maryland Declaration of Rights. (ECF No. 27 at ¶¶ 104–09.) Count IV, also brought against all Defendants, alleges violations of that Article on the theory of municipal liability described in *Prince George's County v. Longtin*, 19 A.3d 859 (Md. 2011), the Maryland analogue to *Monell*.[7] (*See* ECF No. 27 at ¶¶ 110–16.)

Two theories of liability concern violations of federal statutory law. Count VI, brought against the County, alleges violations of Arthur's rights under the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12101–213. (ECF No. 27 at ¶¶ 121–24.) Count VII, also brought against only the County, alleges violations of Arthur's rights under the Rehabilitation Act of 1973, 29 U.S.C. §§ 701–97. (ECF No. 27 at ¶¶ 125–27.)

Finally, two theories of liability concern violations of Maryland common law. Count V, brought against the Wellpath employees (Voeller and Nurses Littlepage, Watson, and Hearn), alleges medical negligence. (ECF No. 27 at ¶¶ 117–20.) And Count VIII, brought against all Defendants, alleges wrongful death. (*Id.* at ¶¶ 128–31.)

The Amended Complaint, (ECF No. 27), remains the operative pleading. One defendant, Officer Thompson, has filed an answer. (ECF No. 32.) Each other defendant has moved to dismiss all claims brought against it (or them). (*See* ECF No. 33 (County); ECF No. 41 (Corporal Cook); ECF No. 48 (Sergeant Campbell); ECF No. 53 (Wellpath, Voeller, and Nurse Hearn); ECF No. 64 (Nurses Watson and Littlepage).) Again, the Court considers only those motions brought by the County, Corporal Cook, and Sergeant Campbell. *See supra* note 2.

---

[7] While the right of action for state and local officials' violations of the federal constitution is provided by statute, 42 U.S.C. § 1983, Maryland state and local officials' violations of the *state* constitution—whether discrete or systemic, under *Longtin*—are vindicable through a right of action supplied by Maryland common law. *See Rovin v. State*, 321 A.3d 201, 226 & n.28 (Md. 2024) (citing *DiPino v. Davis*, 729 A.2d 354 (Md. 1999)).

## II.    LEGAL STANDARDS

When considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court must "accept as true all well-pleaded allegations and view the complaint in the light most favorable to the plaintiff." *Venkatraman v. REI Sys., Inc.*, 417 F.3d 418, 420 (4th Cir. 2005). To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* This is so even when the allegations underlying the claim are "doubtful in fact." *See Twombly*, 550 U.S. at 555.

## III.   ANALYSIS

Plaintiffs bring six claims against the County and four claims against both Corporal Cook and Sergeant Campbell. Five of the six claims against the County will be dismissed; just one will survive. All claims against Corporal Cook and Sergeant Campbell will be dismissed.

### A.    Plaintiffs' Claims Against the County Will Be Dismissed in Part.

Against the County, Plaintiffs fail to state five of their six claims. Their *Monell*, *Longtin*, ADA, and Rehabilitation Act claims will be dismissed without prejudice, while their wrongful-death claim will be dismissed with prejudice. Their *respondeat superior* claim under the Maryland Declaration of Rights will survive. The Court addresses each in turn.[8]

---

[8] In its motion to dismiss, the County asks in the alternative to stay and bifurcate discovery as to certain claims, in the event the Court denies dismissal of those claims. (*See* ECF No. 33 at 1; ECF No. 33-1 at 23–25.) The only claim the Court will not wholly dismiss is Count III, Plaintiffs' claim based on individual violations of Article 24 of the Maryland Declaration of Rights. *See infra* Section III.A.2. Although the County does ask to stay and bifurcate discovery as to that claim, too, it makes clear it does so only if the Court determines "that Count III asserts a *Longtin*-type claim." (*See* ECF No. 33-1 at 23.) And because the Court interprets Count III to assert a *respondeat superior* claim, not a *Longtin* claim, which the Court understands to be the focus of Count IV, *see infra* Section III.A.2, .3, this in-the-alternative request, by its own terms, does not apply, and therefore will be denied. Should the County desire to clarify and renew its request, it is of course permitted to do so.

11

    1.      Count II (Plaintiffs' *Monell* Claims of Systemic Violations of the Eighth and Fourteenth Amendments) Will Be Dismissed Without Prejudice as Against the County.

In *Monell v. Department of Social Services*, the Supreme Court recognized that, in certain circumstances, municipalities may be held liable under § 1983 for the conduct of individual actors who violate a plaintiff's federal rights. 436 U.S. 658, 694 (1978). To state a viable *Monell* claim, it is not enough for the plaintiff to invoke ordinary principles of *respondeat superior*. *See id.* at 691; *Spell v. McDaniel*, 824 F.2d 1380, 1385 (4th Cir. 1987). Rather, the plaintiff must show that individual actors violated the plaintiff's federal rights pursuant to some policy or custom of the local government. *See Monell*, 436 U.S. at 690–91, 694; *Owens v. Balt. City State's Att'ys Off.*, 767 F.3d 379, 402 (4th Cir. 2014).

To that end, a *Monell* claim has three essential elements. First, as with any claim brought under § 1983, a plaintiff must identify a violation of a right conferred by either the Constitution or a federal statute. *See Gonzaga Univ. v. Doe*, 536 U.S. 273, 282 (2002); *Smith v. Kirk*, 821 F.2d 980, 982, 984 (4th Cir. 1987). Second, the plaintiff must locate within the local government an unlawful "policy or custom"—a decision or pattern of behavior whose authority or pervasiveness gives it the force of law—to ensure that any violative acts taken thereunder "may fairly be said to be those of the municipality."[9] *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 403–04 (1997) (citing *Monell*, 436 U.S. at 694); *see Milligan v. City of Newport News*, 743 F.2d 227, 229–30 (4th Cir. 1984); *Stitely v. YesCare*, Civ. No. JKB-24-1512, 2024 WL 3200881, at \*2 (D. Md. June 27,

___

[9] The Court declines to follow the County's approach of splitting this element into two parts, one requiring a "policy or custom," the other requiring that policy or custom to be "fairly attributable to the local government." (*See* ECF No. 33-1 at 9.) While this approach arguably finds some support in the caselaw, *see, e.g.*, *Spell*, 824 F.2d at 1386–87; *Jordan ex rel. Jordan v. Jackson*, 15 F.3d 333, 338 (4th Cir. 1994); *Johnson v. Balt. Police Dep't*, 452 F. Supp. 3d 283, 307–08 (D. Md. 2020), the Supreme Court has repeatedly indicated that the entire purpose of the policy-or-custom element is to prevent municipal liability for acts *not* "fairly attributable" to the municipality. *See, e.g.*, *Connick v. Thompson*, 563 U.S. 51, 60–61 (2011); *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 403–04 (1997); *City of Canton v. Harris*, 489 U.S. 378, 388–89 (1989); *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479–80 (1986).

2024). Third, the plaintiff must show causation—specifically, that the policy or custom was the "moving force" behind the act or acts that caused the violation at issue. *Brown*, 520 U.S. at 404; *Milligan*, 743 F.2d at 230 (quoting *Polk County v. Dodson*, 454 U.S. 312, 326 (1981)); *Stitely*, 2024 WL 3200881, at *2 (citation omitted).

The second element, that of a municipal policy or custom, is difficult to satisfy. As the Fourth Circuit has explained, the element can be met by any of four distinct factual theories:

> A policy or custom for which a municipality may be held liable can arise in four ways: (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that "manifest[s] deliberate indifference to the rights of citizens"; or (4) through a practice that is so "persistent and widespread" as to constitute a "custom or usage with the force of law."

*Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003) (citation omitted). Here, Plaintiffs mount three such theories—two in the third category (omissions), one in the fourth (customs or practices). The omission-based theories assert the County failed to adopt a policy adequate to treat the risks of withdrawal among the inmate population, (*see* ECF No. 27 at ¶¶ 85–86, 88–89, 91), and failed to train the Jail's staff on how to handle the same, (*see id.* at ¶¶ 95–97). The custom-or-practice–based theory asserts the County condoned a practice within the Jail's staff of failing to recognize, treat, or refer inmates who exhibited withdrawal symptoms. (*See id.* at ¶¶ 87–89, 91.)[10]

On each of these three theories, Plaintiffs fail to state the policy-or-custom element of a

---

[10] The Amended Complaint unhelpfully collapses these three theories under just two headings: "Widespread Custom or Practice," (*see* ECF No. 27 at ¶¶ 85–94), and "Failure to Train," (*see id.* at ¶¶ 95–102). But, as explained, Plaintiffs also refer to the County's alleged "[f]ail[ure] to implement a policy." (*Id.* at ¶¶ 85–86; *see also* ECF No. 38 at 6.) And the Fourth Circuit has indicated that a failure to train is just one of multiple possible omission-based theories. *See Lytle*, 326 F.3d at 471. Recalling Rule 8's admonition that "[p]leadings must be construed so as to do justice," Fed. R. Civ. P. 8(e), Plaintiffs clearly intend to invoke a theory beyond the two denominated in their section headers.

At the same time, the Court does not interpret Plaintiffs' later contention that the County "[m]aintained an official policy of denying medication-assisted treatment to pretrial detainees suffering from opioid use disorder," (ECF No. 38 at 6), as raising a distinct, *fourth* theory of policy or custom. Failing to adopt a policy that provides for medication-assisted treatment, (*see* ECF No. 27 at ¶¶ 85–86), appears to be functionally indistinguishable from "denying" such treatment, and Plaintiffs offer no reason for the Court to think otherwise.

*Monell* claim.[11]  The Court considers these theories in detail below.

### i.     *Custom or Practice*

On a custom-or-practice theory, "[s]poradic or isolated violations of rights will not give

rise to *Monell* liability; only 'widespread or flagrant' violations will." *Owens*, 767 F.3d at 402–03

(quoting *Spell*, 824 F.2d at 1387)).  Accordingly, to survive dismissal, a plaintiff must "plead facts

of prior similar incidents." *Williams v. Mayor*, Civ. No. WMN-14-1125, 2014 WL 5707563, at

*3 (D. Md. Nov. 4, 2014).  "It is not enough to allege the instance at hand and infer that it is part

of a broader practice." *Krell v. Queen Anne's County*, Civ. No. JKB-18-637, 2018 WL 6523883,

at *16 (D. Md. Dec. 12, 2018) (citing *Walker v. Prince George's County*, 575 F.3d 426, 431 (4th

Cir. 2009)).

Far from alleging prior unlawful conduct on the part of the County, Plaintiffs allude only

to the prior acts of a separate defendant, Wellpath—and even then, only in connection with alleged

conduct "at other correctional facilities" and/or "in a neighboring county." (*See* ECF No. 27 at

¶¶ 90, 92–94.)  They blame this dearth of allegations on "intentional concealment" by the County,

as well as the idea that medical neglect of the kind at issue becomes public only when it leads to

an inmate's serious injury or death—two considerations that, in Plaintiffs' view, simply

"highlight[] the need for additional discovery." (*See* ECF No. 38 at 11; *see also id.* at 6 n.3.)

But Plaintiffs cannot have it both ways.  Either they have information or belief about similar

incidents sufficient to make out a plausible, custom-based *Monell* claim, in which case they must

allege as much in their pleadings, or they do not, in which case their claim—again, to the extent it

is rooted in a municipal custom—cannot be sustained. *See Twombly*, 550 U.S. at 556 ("Asking

for plausible grounds to infer [unlawful conduct] . . . simply calls for enough fact to raise a

---

[11] Because this is dispositive, the Court need not address the federal-rights and causation elements.

reasonable expectation that discovery will reveal evidence of illegal [behavior]."). While pre-discovery information disparities may *inform* the Court's inquiry at this stage, *see Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."), in no case can these disparities—even significant ones—dispense with basic pleading requirements. *See Valentine v. PrimeCare Med., Inc.*, 697 F. Supp. 3d 431, 446 (D. Md. 2023). Plaintiffs' mere oblique suggestion of similar neglect, (*see* ECF No. 38 at 11 (accusing the County of "regularly set[ting] fires that only occasionally burn down the house")), falls short. *See, e.g.*, *Krell*, 2018 WL 6523883, at *16.

### ii.   Failure to Adopt a Policy and Failure to Train

To satisfy the policy-or-custom element on an omission-based theory,[12] a plaintiff must plead facts sufficient for a plausible inference of "deliberate indifference to the rights of citizens." *Lytle*, 326 F.3d at 471 (citation omitted); *see also Brown*, 520 U.S. at 407 ("[A] plaintiff seeking to establish municipal liability on the theory that a facially lawful municipal action has led an employee to violate a plaintiff's rights must demonstrate that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences." (quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989))).

To show "deliberate indifference," a plaintiff must show, in part, that a local government's policies or training protocols are deficient. *Estate of Jones v. City of Martinsburg*, 961 F.3d 661, 672 (4th Cir. 2020). Plaintiffs seek to do so by alleging the County had *no* policy or protocol for treating inmates' withdrawal. (*See, e.g.*, ECF No. 27 at ¶ 85 (alleging a "fail[ure] to implement a

---

[12] While authority on omission-based theories has developed largely in the context of alleged failures to train, alleged failures to adopt a necessary policy are governed by the same standard. *See, e.g.*, *Milligan*, 743 F.2d at 230; *Cruz v. Bd. of Supervisors*, 983 F.2d 1055, at *1 n.3 (4th Cir. 1993); *Austin v. City of Pasadena*, 74 F.4th 312, 332 (5th Cir. 2023); *Davis v. White*, 794 F.3d 1008, 1014 (8th Cir. 2015). Accordingly, the Court considers these theories together.

15

policy addressing inmate alcohol/drug withdrawal"); *id.* at ¶ 96(a) (alleging a "fail[ure] to, among

other things, train . . . officers to recognize the signs and symptoms of withdrawal").) But these

assertions are undercut by others—namely, those describing withdrawal-related services Jail staff

*did* provide. (*See, e.g.*, *id.* at ¶¶ 46–47, 57, 59 (COWS assessments); *id.* at ¶ 96(a) ("quick detox

check"); *id.* at ¶¶ 46, 62 (palliative medications); *see also* ECF No. 48-4 at 21–31 (listing reminders

for "Detox Monitoring"); *id.* at 49–50 (mentioning "detox protocol").) Accordingly, the argument

from a total absence of treatment fails, and Plaintiffs must instead demonstrate how the County's

*existing* policies were inadequate for their purpose. *See Jones*, 961 F.3d at 672.

This they fail to do. First, Plaintiffs do not plead facts about prior, similar incidents. *See*

*supra* Section III.A.1.i. But, as with custom-or-practice claims, it is also "ordinarily necessary"

for a plaintiff to plead "[a] pattern of similar constitutional violations" by individual employees to

state a claim based on an omission, whether that be a failure to adopt a policy or a failure to train.

*See Connick v. Thompson*, 563 U.S. 51, 62 (2011) (quoting *Brown*, 520 U.S. at 409). "Without

notice that a [decision] is deficient in a particular respect, decisionmakers can hardly be said to

have deliberately chosen a training program [or policy] that will cause violations of [federal]

rights." *Id.* Multiple courts in this circuit have applied that principle to dismiss or deny claims

brought under circumstances akin to those alleged here—namely, upon death or serious injury

from untreated or unmonitored withdrawal in a carceral setting. *See, e.g.*, *Rice v. Cecil County*,

Civ. No. MJM-23-2344, 2024 WL 4335722, at *6 (D. Md. Sept. 27, 2024); *Harrington v. S. Health*

*Partners, Inc.*, Civ. No. LCB-21-744, 2023 WL 3393569, at *15–16 (M.D.N.C. May 11, 2023);

*Wright v. Granville County*, Civ. No. 20-CT-3362-M, 2024 WL 1376486, at *23–24 (E.D.N.C.

Mar. 29, 2024).

Second, Plaintiffs do not situate Arthur's death within the "narrow range of circumstances"

16

that justify the imposition of "single-incident" liability. *See Connick*, 563 U.S. at 63. This form of liability is "rare," reserved for situations in which the illegal consequences of an omission are "so patently obvious" that it would be appropriate to hold a municipality liable "without proof of a pre-existing pattern of violations." *Id.* at 64 (quoting *Brown*, 520 U.S. at 409). In practice, a single-incident theory is "almost never enough" for a claim to succeed. *Jones*, 961 F.3d at 672.

Such is the case here. To start, Plaintiffs' statistics lack context necessary to show "patent[] obvious[ness]" regarding Arthur's suicide risk. Specifically, while they do show a heightened risk of self-harm among various categories of inmate, including inmates undergoing withdrawal, (*see, e.g.* ECF No. 27 at ¶¶ 39–40, 44, 53, 56, 88–89), they lack any baseline against which to evaluate the putative risk factors. (*See, e.g., id.* at ¶ 40 (alleging that "[t]he vast majority of jail suicide victims . . . are white males under age 40" and that "[m]ost jail suicide victims . . . were intoxicated or going through withdrawal," yet supplying no information about the likelihood of jail suicide as an initial matter, let alone how much *more* likely suicide is for inmates who fall into the categories described).) This leaves the Court with only broad, somewhat conclusory descriptions of risk, like suicide being "a known epidemic" in detention facilities, (*id.*), Arthur standing a "substantial risk [of] suicidal behavior," (*id.* at ¶ 42), and medication-assisted treatment being "the standard of care for opioid withdrawal" in carceral settings, (*id.* at ¶ 53). Even taking these descriptions as true, it is hardly clear the suicide risk was "so patently obvious" as to justify single-incident liability.

What's more, the pleadings are replete with indications that Jail staff *did* monitor Arthur's mental health. Plaintiffs themselves allege that Jail personnel recorded, on several occasions, that Arthur had flagged his imminent or ongoing withdrawal. (*See, e.g.*, ECF No. 27 at ¶¶ 25–26, 37–38, 53.) And multiple of the documents upon which Plaintiffs rest their claims reveal a battery of questions about inmates' mental health, including suicidal ideation, if any, and reflect that Arthur

17

repeatedly disclaimed mental distress. (*See, e.g.*, ECF No. 48-3 at 2; ECF No. 48-4 at 6, 10, 13, 17, 49–50; ECF No. 48-7 at 1.) Again, given Plaintiffs' reliance upon these records, and absent any specific allegation to the contrary, the Court assumes Jail personnel recorded Arthur's responses faithfully. *See supra* note 5. And those responses subvert any plausible inference that the County was profoundly inattentive to Arthur's withdrawal or risk of suicide.

For these reasons, Plaintiffs have not stated the policy-or-custom element of their *Monell* claim. Whether Arthur's suicide might have been prevented by more robust protections—among them, perhaps, a medication-assisted treatment program—is not for the Court to decide. The only question before the Court is whether the pleadings permit a plausible inference that a municipality adopted so callous an attitude toward a grave and likely risk that it should face § 1983 liability. Here, they permit no such inference. Plaintiffs' *Monell* claim will be dismissed without prejudice.

> 2. Count III (Plaintiffs' Claims of Individual Violations of Article 24 of the Maryland Declaration of Rights) Will Be Dismissed in Part, Without Prejudice, as Against the County.

In contrast to their *Monell* and *Longtin* claims, which assert the County's liability for its own policy decisions, Plaintiffs' Article 24 claim asserts the County's liability for the actions of subordinate individuals.[13] While federal law does not recognize any *respondeat superior* liability for local governments based on individuals' violations of federal rights, Maryland common law does recognize such liability based on violations of rights under the state constitution. *DiPino v. Davis*, 729 A.2d 354, 372 (Md. 1999).

As explained below, Plaintiffs fail to state an Article 24 claim against either Corporal

---

[13] The County argues the pleadings are "impermissibly vague" about which theory—*respondeat superior* or *Longtin*—Plaintiffs actually assert in Count III. (*See* ECF No. 33 at 17.) This is unavailing. The very next count, Count IV, is titled "*Longtin* Claim." (ECF No. 27 at 21.) Because that count plainly asserts the County's liability for systemic rights violations, it is clear the instant count, Count III, asserts the County's liability for *discrete* violations, rather than simply parroting the claims of Count IV. (*See id.* at ¶¶ 104–09.) And as the pleadings themselves later state, it is on only a *respondeat superior* theory, not a *Longtin* theory, that the County may be held liable for violations of that type. (*See id.* at ¶ 106 ("Maryland's constitution and its principles of *respondeat superior* liability obligate counties and

Cook or Sergeant Campbell directly. *See infra* Section III.B.2. And without an underlying Article 24 violation by an individual, there can be no corresponding *respondeat superior* liability on the part of a municipality. *See, e.g.*, *DiPino*, 729 A.2d at 370 ("Because that liability is derivative, . . . recovery may not be had against the entity if the employee is found not to be liable or is released.").

Nevertheless, there remain in this matter other Individual Defendants, the claims against whom, for various reasons, the Court does not consider at this time. *See generally supra* note 2; (ECF No. 32 (Answer by Officer Thompson)). And because *respondeat superior* liability turns on a finding of unlawful conduct by an individual who reports to a superior person or entity, *see, e.g.*, *DiPino*, 729 A.2d at 370, it would be inappropriate to dismiss the *respondeat superior* claim in full before considering the Article 24 claims against *all* Individual Defendants. *Cf. Iqbal*, 556 U.S. at 684 ("[W]e express no opinion concerning the sufficiency of [plaintiff's] complaint against the defendants who are not before us. [Plaintiff's] account of his prison ordeal alleges serious official misconduct that we need not address here.").

Accordingly, Plaintiffs' *respondeat superior* claim will be dismissed only to the extent it concerns alleged Article 24 violations by either Sergeant Campbell or Corporal Cook.

> 3.   Count IV (Plaintiffs' *Longtin* Claims of Systemic Violations of Article 24 of the Maryland Declaration of Rights) Will Be Dismissed Without Prejudice as Against the County.

Although *Longtin* claims arise out of violations of state, not federal, rights, *see* 19 A.3d at 885, 887, they are governed by the same principles of fault and causation as *Monell* claims. *See, e.g.*, *Krell*, 2018 WL 6523883, at \*16 & n.5. And because "*Monell* and *Longtin* claims rise or fall together, . . . the Court need not undertake an independent analysis of the sufficiency of the latter." *Palma v. Montgomery County*, 598 F. Supp. 3d 288, 297 n.5 (D. Md. 2022) (citing *Krell*, 2018

---

municipalities to avoid constitutional violations by their employees and contract-employees . . . .").) The Court declines to adopt the County's cramped reading of the Amended Complaint.

WL 6523883, at *15).

Because Plaintiffs fail to state a *Monell* claim, *see supra* Section III.A.1, they likewise fail to state a *Longtin* claim. The *Longtin* claim, too, will be dismissed without prejudice.

### 4.   Count VI (Plaintiffs' ADA Claim Against the County) Will Be Dismissed Without Prejudice.[14]

As Plaintiffs themselves observe, (*see* ECF No. 38 at 13–14 & n.10), to establish a *prima facie* case under Title II of the ADA, a plaintiff must show:

> (1) that he is a qualified individual with a disability; (2) that he was either excluded from participation in or denied the benefits of some public entity's services, programs, or activities or was otherwise discriminated against; and (3) that such exclusion, denial of benefits, or discrimination was by reason of his disability.

*Spencer v. Easter*, 109 F. App'x 571, 573 (4th Cir. 2004) (citations omitted); *accord Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 498 (4th Cir. 2005).

Despite alleging facts sufficient to show Arthur had a disability (OUD), (ECF No. 27 at ¶¶ 27, 29), and facts that at least touch on whether he was denied benefits available to others (broadly speaking, adequate medical evaluation and care), (*see id.* at ¶¶ 2, 34–36, 41–43, 53–55, 62, 123), Plaintiffs allege no facts in support of the third element. But "the ADA is not 'violated by a prison's simply failing to attend to the medical needs of its disabled prisoners.'" *Miller v. Hinton*, 288 F. App'x 901, 903 (4th Cir. 2008) (citing *Bryant v. Madigan*, 84 F.3d 246, 249 (7th Cir. 1996)). On the contrary, a plaintiff must show he "was . . . treated worse *because* he was

---

[14] The County seeks dismissal in part because Plaintiffs cite initially to 42 U.S.C. § 12112(b)(5)(A), a plainly off-point provision of the ADA that addresses the rights of employees and job applicants, rather than a relevant provision under Title II. (*See* ECF No. 33-1 at 19 (citing ECF No. 27 at ¶ 123).) But "courts do not dismiss a plaintiff's claim for citation to the wrong statute," much less the wrong part of one, "so long as the basis for the claim is clear from the face of the complaint." *West v. Mayorkas*, Civ. No. JKB-23-1661, 2024 WL 3878375, at *4 n.3 (D. Md. Aug. 20, 2024) (citation omitted). Notwithstanding the error, elsewhere in their pleadings, Plaintiffs *do* cite to a section of Title II. (*See* ECF No. 27 at ¶ 122 (citing 42 U.S.C. § 12131(2)).) And the County is plainly aware that Plaintiffs intend to bring a Title II claim. (*See* ECF No. 42 at 9–10.) Where, as here, "the plaintiff acknowledges the error in responsive briefing and there is no harm to the defendant," dismissal on that basis is particularly inappropriate. *West*, 2024 WL 3878375, at *4 n.3 (citation omitted).

disabled." *Id.* (emphasis added). And where no discrimination is alleged, courts have repeatedly

declined to allow Title II claims to move forward, including against carceral facilities for allegedly

failing to accommodate their disabled inmates, *see, e.g.*, *id.*; *Spencer*, 109 F. App'x at 573, and

even for allegedly failing to treat an inmate's OUD, *see Taylor v. Wexford Health Sources, Inc.*,

Civ. No. ICB-23-0475, 2024 WL 38555, at *4 (S.D. W. Va. Jan. 3, 2024) (citations omitted).[15]

Plaintiffs' ADA claim will be dismissed without prejudice.

### 5. Count VII (Plaintiffs' Rehabilitation Act Claim Against the County) Will Be Dismissed Without Prejudice.[16]

"Claims under the ADA's Title II and [section 504 of] the Rehabilitation Act . . . [are]

substantially the same," with each needing to state the same three elements: disability, exclusion,

and causation. *See Wicomico Nursing Home v. Padilla*, 910 F.3d 739, 750 (4th Cir. 2018) (citation

omitted). Indeed, the third element, causation, is *harder* to meet under the Rehabilitation Act than

it is under the ADA. *Id.* ("To succeed on a claim under the Rehabilitation Act, the plaintiff must

establish he was excluded 'solely by reason of' his disability; the ADA requires only that the

disability was 'a motivating cause' of the exclusion." (citation omitted).)

Because Plaintiffs allege *no* facts showing causation for purposes of their ADA claim, *see*

*supra* Section III.A.4, they plainly cannot meet the Rehabilitation Act's even stricter standard. *See*

*Wicomico*, 910 F.3d at 750.

On top of that, while "Title II applies to any 'public entity,'" section 504 "applies only to

---

[15] *See also Donlon v. Hillsborough County*, Civ. No. LM-18-0549, 2019 WL 2062436, at *9 (D.N.H. May 9, 2019) (declining to dismiss only because "[t]he facts alleged raise[d] a plausible inference of such unreasonable care [for a plaintiff going through withdrawal] that [it] would imply pretext for a discriminatory motive"); *Ferguson v. Palm Beach Cnty. Sheriff's Dep't of Corr.*, Civ. No. RAR-23-81264, 2024 WL 517991, at *2 (S.D. Fla. Feb. 9, 2024) (declining to dismiss where the denial of OUD treatment was allegedly based on a plaintiff's decision to self-medicate with contraband drugs).

[16] As with the ADA claim, the County argues that the Rehabilitation Act claim violates Rule 8(a)(2)'s "short and plain statement" requirement by not supplying the specific standard of conduct Plaintiffs believe the County violated. (*See* ECF No. 33-1 at 20.) True enough, the Amended Complaint does cite broadly to 29 U.S.C. § 701 *et seq.*, a swath of

federal agencies or to 'any program or activity receiving Federal financial assistance.'" *Paulone v. City of Frederick*, 787 F. Supp. 2d 360, 371 (D. Md. 2011). Yet, as Defendants observe, (*see* ECF No. 33-1 at 20), Plaintiffs allege no facts remotely related to federal funding. This, too, is fatal. *See, e.g.*, *Paulone v. City of Frederick*, 718 F. Supp. 2d 626, 634 (D. Md. 2010).

Plaintiffs' Rehabilitation Act claim will be dismissed without prejudice.

> 6.    Count VIII (Plaintiffs' Wrongful-Death Claims) Will Be Dismissed with Prejudice as Against the County.

By wholly failing to respond to the County's argument on this point, Plaintiffs abandon their wrongful-death claim. *See Ferdinand-Davenport v. Children's Guild*, 742 F. Supp. 2d 772, 777, 783 (D. Md. 2010). The claim will be dismissed with prejudice.[17]

## B.    Plaintiffs' Claims Against Corporal Cook and Sergeant Campbell Will Be Dismissed in Their Entirety.

Against Corporal Cook and Sergeant Campbell, Plaintiffs fail to state any of their four claims. Their § 1983, Article 24, and wrongful-death claims will be dismissed without prejudice, while their *Longtin* claims will be dismissed with prejudice. The Court addresses each in turn.

---

the U.S. Code containing dozens of provisions addressing a wide range of topics under the rehabilitation umbrella. (*See* ECF No. 27 at ¶ 126.). But here again, the County is plainly aware of the claim Plaintiffs intend to make. (*See* ECF No. 33-1 at 20.) The County's Rule 8 argument falls flat accordingly. *See supra* note 14.

[17] Had Plaintiffs not abandoned their claim, dismissal with prejudice would remain appropriate. Despite Plaintiffs' allegations of "intentional and willful and wanton conduct," (ECF No. 27 at ¶ 131), wrongful death sounds in negligence, not intentional tort. *See Jones v. Flood*, 702 A.2d 440, 443 (Md. Ct. Spec. App. 1997), *aff'd*, 716 A.2d 285 (Md. 1998). And Maryland's counties are immune from negligence actions whenever the underlying conduct "is governmental, not proprietary." *Doe v. Cmty. Coll. of Balt. Cnty.*, 595 F. Supp. 3d 392, 411 (D. Md. 2022) (citing *Pavelka v. Carter*, 996 F.2d 645, 648 (4th Cir. 1993)). This Court has recognized that, for purposes of that immunity, operating a county detention facility "is unquestionably a government activity." *McMahon v. Cnty. Comm'rs*, Civ. No. JFM-13-0490, 2013 WL 2285378, at *5 (D. Md. May 21, 2023) (citing *Gray-Hopkins v. Prince George's County*, 309 F.3d 224, 234 (4th Cir. 2002)). It has also held the immunity to apply regardless of whether a suit asserts direct or vicarious liability. *See, e.g.*, *Mendygral v. Mayor & City Council of Ocean City*, Civ. No. ELH-21-1381, 2022 WL 125275, at *7 (D. Md. Jan. 13, 2022) (citations omitted); *DiPino*, 729 A.2d at 369–70.

1.  Count I (Plaintiffs' Claims of Individual Violations of the Eighth and Fourteenth Amendments) Will Be Dismissed Without Prejudice as Against Corporal Cook and Sergeant Campbell.

To state a § 1983 claim against an individual, a plaintiff must allege facts in support of two elements. First, a plaintiff must allege the violation "of a right secured by the Constitution or a federal statute." *Jenkins v. Medford*, 119 F.3d 1156, 1159–60 (4th Cir. 1997); *accord West v. Atkins*, 487 U.S. 42, 48 (1988). Second, the plaintiff must allege the violation was caused by an individual "acting under color of state law." *West*, 487 U.S. at 48. Neither officer argues Plaintiffs fail to plead the second element, so the Court considers only the first.

Plaintiffs claim violations of Arthur's rights under the Eighth and Fourteenth Amendments. (ECF No. 27 at ¶ 71.) They rest these claims on an alleged denial of reasonable medical care in a carceral setting. (*See id.* at ¶ 75.) For claims of inadequate medical care, the Eighth Amendment governs the rights of post-conviction detainees, while the Fourteenth governs the rights of those detained before trial. *Brown v. Harris*, 240 F.3d 383, 388 (4th Cir. 2001); *Hill v. Nicodemus*, 979 F.2d 987, 990–91 (4th Cir. 1992) ("While a convicted prisoner is entitled to protection only against 'cruel and unusual' punishment, a pretrial detainee, not yet found guilty of any crime, may not be subjected to punishment of any description."). The law remains unsettled, however, as to which Amendment governs the rights of those being held on suspicion of a probation violation, *see, e.g.*, *Brown*, 240 F.3d at 388; *Valentine*, 697 F. Supp. 3d at 442, to say nothing of those, like Arthur, held on suspicion of violating *prejudgment* probation, (ECF No. 27 at ¶ 23).

Until recently, for purposes of analyzing claims of deficient carceral medical care, courts in this circuit treated the two Amendments as presenting "a distinction without a difference." *E.g.*, *Valentine*, 697 F. Supp. 3d at 488. That was because the standard of liability was the same under both: deliberate indifference to a detainee's serious medical needs. *Id.*; *Brown*, 240 F.3d at 388;

23

*Hill*, 979 F.2d at 991.

Nevertheless, the Fourth Circuit, following the Supreme Court's decision in *Kingsley v. Hendrickson*, 576 U.S. 389 (2015), recently clarified that the meaning of "deliberate indifference" varies slightly, though consequentially, between the two Amendments. *See Short v. Hartman*, 87 F.4th 593, 612 (4th Cir. 2023). A plaintiff who seeks to state a claim for deliberate indifference under the Fourteenth Amendment must plead that:

> (1) they had a medical condition or injury that posed a substantial risk of serious harm; (2) the defendant intentionally, knowingly, or recklessly acted or failed to act to appropriately address the risk that the condition posed; (3) the defendant knew or should have known (a) that the detainee had that condition and (b) that the defendant's action or inaction posed an unjustifiably high risk of harm; and (4) as a result, the detainee was harmed.

*Id.* at 611. By contrast, an Eighth Amendment plaintiff will have more difficulty pleading the third element, which, for purposes of that Amendment, demands that a defendant "had *actual knowledge* of the detainee's serious medical condition" and "*consciously disregarded* the risk that their action or failure to act would result in harm." *See id.* (emphases added).[18]

In this case, the Court need not decide which flavor of deliberate indifference applies to a detainee in Arthur's somewhat unusual position, as Plaintiffs have not alleged facts sufficient to permit a plausible inference of either.

First, the pleadings do not support a plausible inference of a "substantial risk of serious harm." Crucially, for purposes of Plaintiffs' claim, the underlying serious harm they must allege is not Arthur's withdrawal in general, but his suicide in particular. (*See* ECF No. 27 at ¶¶ 1–2.) Yet despite asserting "significant suicide risks," (*id.* at ¶ 2,) and a "substantial risk for suicidal behavior," (*id.* at ¶ 42), as explained above, the statistics Plaintiffs offer describe a heightened risk

---

[18] Put another way, for purposes of the third element, the Eighth Amendment employs the subjective standard used for criminal recklessness, while the Fourteenth Amendment employs the objective standard used for *civil* recklessness. *See Short*, 87 F.4th at 607, 611.

of suicide only in relative terms, with no indication of its absolute magnitude. *See supra* Section III.A.1.ii. This is a problem, as the Court cannot infer even a trivial risk of some event occurring, much less a "substantial" one, from the mere fact that the event is more *likely* to occur under certain conditions. (*See, e.g.*, ECF No. 27 at ¶ 72 (noting merely "an increased risk of suicide").) And simply saying that a risk is "significant" or "substantial" does not make it so.

Second, the pleadings do not support a plausible inference that either officer "failed to act to appropriately address" Arthur's suicide risk. Plaintiffs allege Sergeant Campbell first met with Arthur at booking, when she learned about his withdrawal, (ECF No. 27-6 at 5), then met with him again later for classification, after which she noted he was "doing . . . fine" and "compliment[ing] how well he was being treated," despite self-reporting withdrawal symptoms, (*id.* at ¶¶ 51–52). Plaintiffs also describe her as having told Arthur the Jail had no methadone program, (*id.* at ¶ 53), but omit to mention that she reported informing him of the Jail's "detox protocol," assuring him "that medical w[ould] take care of him," telling him "that if he needed anything to let the officers know," and escorting him back to his unit "without any issues," (ECF No. 48-7 at 1–2). Finally, Plaintiffs accuse her of failing "to observe that [Arthur's] repeated pleas for medication assisted treatment . . . w[ere] a clear sign of mental health distress" and of "t[aking] no action to mitigate the risk of [Arthur's] suicide." (ECF No. 27 at ¶ 96(b).) Plaintiffs allege even less about Corporal Cook, asserting only that he "opened the door to Mr. Arthur's cell block," "summoned Mr. Arthur into the vestibule for COWS protocol," "remained outside the cell block during this visit," "filed a self-serving incident note after the fact stating that he observed 'good demeanor' and 'nothing out of the ordinary,'" and failed to respond to Arthur's "active, visible tremors and severe tachycardia." (ECF No. 27 at ¶¶ 57–58, 96(a).)[19]

---

[19] The Court does not credit the multiple allegations Plaintiffs level against the Individual Defendants as a group. (*See, e.g.*, ECF No. 27 at ¶ 76.) "While group pleading can be permissible in certain circumstances, it must be 'plausible

Viewing these allegations in the light most favorable to Plaintiffs, the worst picture that plausibly emerges still shows both Corporal Cook and Sergeant Campbell actively participating in efforts to monitor Arthur's detoxification. Even the most damning suggestion—that Cook simply ignored Arthur's "active, visible tremors and severe tachycardia," (*see* ECF No. 27 at ¶ 96(a))— is undercut by the allegation that Cook "remained outside the cell block," which Plaintiffs already used to cast doubt on the nonnegative aspects of his report, (*see id.* at ¶ 58).

What's more, "nonmedical prison official[s]" are usually "entitled to rely on the opinions, judgment, and expertise of prison medical personnel in determining the medically necessary course of treatment." *Hendrick v. Booth*, Civ. No. TDC-14-4021, 2015 WL 8055172, at *6 n.3 (D. Md. Dec. 3, 2015) (citing *Miltier v. Beorn*, 896 F.2d 848, 854 (4th Cir. 1990), *partial abrogation recognized by Fidrych v. Marriott Int'l, Inc.*, 952 F.3d 124, 146 (4th Cir. 2020)), *aff'd*, 654 F. App'x 136, 137 (4th Cir. 2016). Even if the Court discounts Voeller's assessments, taking as true Plaintiffs' assertions that she was unqualified to make them, (*see* ECF No. 27 at ¶¶ 34–36, 41–43), Arthur's medical chart nevertheless shows multiple entries made by nurses whose qualifications Plaintiffs do not dispute, each showing Arthur denied having thoughts of self-harm. (*See* ECF No. 48-4 at 17 (Nurse Littlepage recording "No" in response to the question "Expresses thoughts about self-harm?"); *id.* at 49 (Nurse Littlepage noting "No SI [suicidal ideation] at this time" following the first COWS assessment); *id.* at 49–50 (Nurse Hearn noting "Patient denies any SI" following the second COWS assessment); *see also* ECF No. 48-3 at 2 (Officer Townsend recording "NO" in response to questions about prior suicide attempts, thoughts of suicide or self-harm, and diagnoses

---

that each defendant was involved in all of the facts as alleged.'" *McPherson v. Balt. Police Dep't*, 494 F. Supp. 3d 269, 280 (D. Md. 2020) (quoting *Sprint Nextel Corp. v. Simple Cell, Inc.*, Civ. No. CCB-13-617, 2013 WL 3776933, at *2 (D. Md. July 17, 2013)). And here, it is plain Plaintiffs lump various allegations together in an effort to impute them to the Individual Defendants collectively. (*See, e.g.*, ECF No. 27 at ¶ 76(g)–(h) (accusing all Individual Defendants of "[f]ailing to recognize" the risks surfaced by Arthur's "severe tachycardia," despite alleging "severe tachycardia" only in respect to Arthur's interaction with Corporal Cook and Nurse Hearn, (*see id.* at ¶¶ 58–60, 96(a))).)

of mental illness).)  At bottom, "[t]he law cannot demand that officers be mind-readers," *Short*, 87 F.4th at 614 n.10 (quoting *Grayson v. Peed*, 195 F.3d 692, 695 (4th Cir. 1999)), and where essential information is unknown even to designated medical staff, despite apparent efforts to ascertain it, the Court faces "a very different situation" from those usually held to harbor possible constitutional violations. *See id.* at 613–14 & n.10 (recognizing "deliberate indifference" where an officer had actual knowledge of "a previous suicide attempt, active and severe withdrawal, and a [policy] that unambiguously instructs officers that in this exact situation additional steps must be taken").

In effect, Plaintiffs ask the Court to infer, from the bare fact of Arthur's death, that whatever Corporal Cook and Sergeant Campbell did was inadequate. (*See* ECF No. 27 at ¶¶ 96(a)–(b).) But Plaintiffs do not say how the officers should, or even could, have acted differently. And critically, "[m]ost deliberate-indifference cases address the *denial* of medical care to a prisoner, [not] the provision of substandard care"—in other words, "*no* care, rather than bad care." *Gardner v. United States*, 184 F. Supp. 3d 175, 181 (D. Md. 2016) (cleaned up) (emphases added) (quoting *Jones v. United States*, Civ. No. 11-115, 2012 WL 7681938, at *7 (N.D. W. Va. Dec. 18, 2012)).  While a substandard-care claim "*may* be cognizable," it is cognizable only in "unusual circumstances, such as where the treatment provided is 'so cursory as to amount to no treatment at all.'" *Id.* (emphasis added) (quoting *King v. United States*, 536 F. App'x 358, 360 (4th Cir. 2013)).  So, even if Plaintiffs had made specific allegations about what made Arthur's care deficient, they would still have to show his care to be tantamount to nothing—an inference the allegations do not support.

Third, and finally, the pleadings do not support a plausible inference that either officer knew (or should have known) their alleged inaction "posed an unjustifiably high risk of harm." Again, the statistics Plaintiffs offer describe a relatively high*er* risk of suicide—not a high one, let alone one that is "unjustifiably high." *See supra* Section III.A.1.ii.  Because these allegations leave

the Court unable to infer anything about the suicide risk as an objective matter, the Court is unable

to say the officers should have drawn such an inference themselves. *See id.* That critical inference

is made even less plausible by the absence of allegations of prior, similar incidents, *see id.*, as well

as the adopted allegations of Arthur's repeated denials of self-harming thoughts, *see supra* note 5;

*supra* Section III.A.1.ii.

In sum, the same basic considerations that defeat Plaintiffs' *Monell* claim also defeat their

ability to state a violation of Arthur's federal rights by Corporal Cook and Sergeant Campbell.[20]

Accordingly, Plaintiffs fail to state a viable § 1983 claim against either officer—both as a pleading

matter, *see Jenkins*, 119 F.3d at 1159–60, and as a matter of qualified immunity, *see Stanton v.*

*Elliott*, 25 F.4th 227, 235 (4th Cir. 2022) (explaining that qualified immunity applies when either

(1) a plaintiff fails to state a violation of a federal right or (2) a defendant shows the right was not

clearly established); *Cox v. Quinn*, 828 F.3d 227, 238 (4th Cir. 2016) (observing that correctional

officers are among those protected by qualified immunity).[21]  The § 1983 claims against Cook and

Campbell will be dismissed without prejudice.

> 2.  Count III (Plaintiffs' Claims of Individual Violations of Article 24 of the
>     Maryland Declaration of Rights) Will Be Dismissed Without Prejudice as
>     Against Corporal Cook and Sergeant Campbell.

"While Article 24 may, in some cases, offer *more* protection than the due process clause

of the Fourteenth Amendment," here, Plaintiffs "offer no examples where Maryland courts have

held that a pretrial detainee's state constitutional rights in this context exceed those guaranteed by

---

[20] The Court need not consider whether "deliberate indifference" carries precisely the same meaning for Eighth and Fourteenth Amendment purposes as it does for *Monell* purposes.  It is enough to observe that the facts and allegations that bear on one tend bear on the other, too.

[21] Having determined that Plaintiffs fail to state a violation of Arthur's federal rights, there is no need for the Court to address, for qualified-immunity purposes, whether any such right was "clearly established" at the time. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009) ("The judges of the district courts . . . [are] permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.").

the Fourteenth Amendment." *See Wallace v. Moyer*, Civ. No. CCB-17-3718, 2020 WL 1506343, at *6 n.10 (D. Md. Mar. 30, 2020) (emphasis in original) (internal citation omitted). Instead, they argue only that a sufficiently stated § 1983 claim would make it "improper" to dismiss their Article 24 and wrongful-death claims. (*See* ECF No. 45 at 6 n.1.)

But Plaintiffs have not sufficiently stated a § 1983 claim against either officer. *See supra* Section III.B.1. Absent any reason to think Article 24 is more protective in this context than either the Eighth or Fourteenth Amendment, Plaintiffs' state constitutional claims must fail as well. *See Wallace*, 2020 WL 1506343, at *6 n.10. The Article 24 claims against Corporal Cook and Sergeant Campbell will be dismissed without prejudice.

> 3.  Count IV (Plaintiffs' *Longtin* Claims of Systemic Violations of Article 24 of the Maryland Declaration of Rights) Will Be Dismissed with Prejudice as Against Corporal Cook and Sergeant Campbell.

By wholly failing to respond to Corporal Cook's and Sergeant Campbell's arguments on this point, Plaintiffs abandon their *Longtin* claims. *See Ferdinand-Davenport*, 742 F. Supp. 2d at 777. The claims will be dismissed with prejudice.[22]

> 4.  Count VIII (Plaintiffs' Wrongful-Death Claims) Will Be Dismissed Without Prejudice as Against Corporal Cook and Sergeant Campbell.

Although Maryland law grants no immunity to public officials sued for state constitutional torts, *DiPino*, 729 A.2d at 371, it does recognize a version of qualified immunity, called public-official immunity, as shielding those whose official, discretionary acts are the subject of common-

---

[22] As above, even if Plaintiffs had not abandoned their claims, dismissal with prejudice would remain appropriate. *See supra* note 17. Like *Monell*, *Longtin* "creates liability upon the municipality for [the] unconstitutional actions of its employees, *not* liability upon the individual employee." *Grim v. Balt. Police Dep't*, Civ. No. ELH-18-3864, 2019 WL 5865561, at *26 (D. Md. Nov. 8, 2019) (emphasis in original) (quoting *Devi v. Prince George's County*, Civ. No. DKC-16-3790, 2017 WL 3592452, at *4 (D. Md. Aug. 21, 2017)). For that reason, "courts in this District have held that a plaintiff cannot lodge a *Longtin* claim against an individual defendant." *Id.* (collecting cases).

law negligence claims.[23] *See, e.g., id.* at 370; *Johnson v. Balt. Police Dep't*, 452 F. Supp. 3d 283, 297 (D. Md. 2020). This immunity "is intended to be a defense against claims that a 'better choice' could have been made." *Lee v. Cline*, 863 A.2d 297, 307 (Md. 2004).

Under the doctrine of public-official immunity, Corporal Cook and Sergeant Campbell are at least presumptively immune to Plaintiffs' wrongful-death claims. As explained with respect to the County, wrongful-death claims sound in negligence. *See Jones*, 702 A.2d at 443. Moreover, correctional officers are public officials, *see Cooper v. Rodriquez*, 118 A.3d 829, 856 (Md. 2015), who, insofar as they act "within the scope of their law enforcement function," "clearly act[] in a discretionary capacity," *see Robinson v. Bd. of Cnty. Comm'rs*, 278 A.2d 71, 74 (Md. 1971) (citation omitted). Because Cook and Campbell are correctional officers, and because no party suggests they acted outside the scope of their law enforcement function, (*see* ECF No. 27 at ¶¶ 10, 12, 51–53, 57–58), they are *prima facie* candidates for public-official immunity.

To defeat public-official immunity, a plaintiff must show an official to have acted with gross negligence or malice. *See Johnson*, 452 F. Supp. 3d at 297 (first citing *Thomas v. City of Annapolis*, 688 A.2d 448, 454 (Md. Ct. Spec. App. 1997), and then citing *Cooper v. Rodriquez*, 118 A.3d 829, 854 (Md. 2015)). In this case, Plaintiffs argue only the former. (*See* ECF No. 45 at 8–9; ECF No. 57 at 8–9.) Under Maryland law, gross negligence requires

> an intentional failure to perform a manifest duty in reckless disregard of the consequences as affecting the life or property of another, and also implies a thoughtless disregard of the consequences without the exertion of any effort to avoid them. Stated conversely, a wrongdoer is guilty of gross negligence . . . only when he [or she] inflicts injury intentionally or is so utterly indifferent to the rights of others that he [or she] acts as if such rights did not exist.

---

[23] Maryland local officials also enjoy statutory immunity from certain tort liability. *See* Md. Code, Cts. & Jud. Proc. § 5-507(a)(1) ("An official of a municipal corporation, while acting in a discretionary capacity, without malice, and within the scope of the official's employment or authority shall be immune from any civil liability for the performance of the action."). Even so, the Court need not undertake two separate analyses, as the statute's purpose was only "to codify *existing* public official immunity, . . . not to extend the scope of qualified immunity beyond its Maryland common law boundaries." *See Lovelace v. Anderson*, 785 A.2d 726, 734 (Md. 2001) (emphasis added) (citation omitted) (describing the predecessor provision).

*Cooper*, 118 A.3d at 845–46 (alterations in original) (quoting *Barbre v. Pope*, 935 A.2d 699, 717 (Md. 2007)). Put another way, gross negligence is "something more than simple negligence, and likely more akin to reckless conduct." *Id.* (quoting *Barbre*, 935 A.2d at 717).

Based on these definitions, the Court views the gross negligence standard as essentially equivalent to that for civil recklessness—the same standard that, as discussed above, governs pretrial detainees' rights under the Fourteenth Amendment. *Compare Cooper*, 118 A.3d at 845–46 (defining gross negligence as "an intentional failure to perform a manifest duty in reckless disregard of the consequences"), *with Short*, 87 F.4th at 607 (defining civil recklessness as "action or failure to act 'in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known'" (quoting *Farmer v. Brennan*, 511 U.S. 825, 836 (1994))). Federal and state courts alike have applied the gross-negligence standard in this manner. *See, e.g.*, *Grant-Walton v. Montgomery Cnty. Bd. of Educ.*, Civ. No. TDC-17-2339, 2018 WL 2451204, at *2–3 (D. Md. May 30, 2018) (collecting cases); *see also Farmer*, 511 U.S. at 836 n.4 (calling "gross negligence" a "nebulous" term that "in practice typically mean[s] little different from recklessness as generally understood in the civil law" (citing W. Keeton et al., *Prosser and Keeton on the Law of Torts* § 34, p. 212 (5th ed. 1984)). And no party supplies any reason to do otherwise here.[24]

Plaintiffs do not meet this standard. While, in general, the question of gross negligence "is properly resolved on the basis of the facts rather than the pleadings," as ever, a plaintiff must plead facts sufficient to permit a plausible inference of the underlying assertion. *See Grant-Walton*, 2018

---

[24] To the extent this Court has said gross negligence demands less than the "deliberate indifference" needed to show a constitutional violation, *see, e.g.*, *Fether v. Frederick County*, Civ. Nos. CCB-12-1674, -13-1083, 2015 WL 507817, at *11 (D. Md. Feb. 6, 2015) (citing *Rodriguez v. State*, 98 A.3d 376, 399–400 (Md. Ct. Spec. App. 2014)); *Murrill v. Merritt*, Civ. No. DKC-17-2255, 2022 WL 4080308, at *17 (D. Md. Sept. 6, 2022), it appears to have done so prior to the recent clarification that the Fourteenth Amendment employs the looser, objective test for civil recklessness, not the stricter, subjective test for criminal recklessness applied under the Eighth, *see Short*, 87 F.4th at 607–08.

WL 2451204, at *3. But Plaintiffs fail to plead, for purposes of their § 1983 claims, the civil recklessness required for a violation of Arthur's rights under the Fourteenth Amendment. *See supra* Section III.B.1. Their wrongful-death claims thus falter under the virtually, if not actually, identical gross-negligence standard.[25] Because this cannot defeat the two officers' putative public-official immunity, the wrongful-death claims against them will be dismissed without prejudice.

## IV.   CONCLUSION

Five of Plaintiffs' six claims against the County will be dismissed. The *Monell*, *Longtin*, ADA, and Rehabilitation Act claims will be dismissed without prejudice, while the wrongful-death claim will be dismissed with prejudice. The *respondeat superior* claim will survive only to the extent it rests on the liability of individuals other than Corporal Cook and Sergeant Campbell.

All of Plaintiffs' claims against Corporal Cook and Sergeant Campbell will be dismissed. The § 1983, Article 24, and wrongful-death claims will be dismissed without prejudice, while the *Longtin* claims will be dismissed with prejudice.

DATED this __11__ day of February, 2025.

BY THE COURT:

_____
James K. Bredar
United States District Judge

---

[25] Even if the standards are different, this Court has made clear that allegations and facts that speak to one speak to the other as well. *See, e.g.*, *Walker v. Heavener*, Civ. No. JKB-16-3136, 2019 WL 3017658, at *7 (D. Md. July 10, 2019) ("For largely the same reasons that the allegations . . . are insufficient to give rise to an inference of deliberate indifference, they are likewise insufficient to give rise to an inference of gross negligence . . . ." (quoting *Young v. City of Mount Ranier*, 238 F.3d 567, 579 (4th Cir. 2001), *partial abrogation recognized by Short*, 87 F.4th at 608)).